AES/CJC:DE/WK/MEB/AS
F. #2016R00481

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against –

SARGEANT MARINE INC.,

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -X

I N F O R M A T I O N

Cr. No. <u>20-CR-363 (ENV)</u>
(T. 18, U.S.C., §§ 371 and 3551 <u>et</u> <u>seq</u>.)

THE UNITED STATES CHARGES:

        At all times relevant to this Information, unless otherwise stated:

I.    <u>The Defendant and Relevant Individuals and Entities</u>

        1.    The defendant Sargeant Marine Inc. ("SMI") was an asphalt company incorporated and based in Boca Raton, Florida.  SMI was a "domestic concern," as that term is used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-2(h)(1).

        2.    Asphalt Trading, the identity of which is known to the United States and the defendant, was a company incorporated in the Bahamas and based in the United States that was one of a group of companies related to the defendant.  Asphalt Trading provided asphalt-related services to customers, including Petrobras and PDVSA (defined below).  Asphalt Trading's principal place of business was in Boca Raton, Florida.  Asphalt

2

Trading was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

3.      SMI Affiliate, the identity of which is known to the United States and the defendant, was a company incorporated in Switzerland that was one of a group of companies related to the defendant.  SMI Affiliate had the same principals as Asphalt Trading and was incorporated after lending institutions withheld lines of credit from Asphalt Trading in or about 2012.

4.      Joint Venture, the identity of which is known to the United States and the defendant, was an asphalt trading joint venture between the defendant and a European energy trading company.

5.      Swiss Asphalt Company, the identity of which is known to the United States and the defendant, was a company incorporated in Switzerland that was in the asphalt business and, at times, a competitor to the defendant.  In or about and between 2012 and 2015, Asphalt Trading entered into various contracts with Swiss Asphalt Company to purchase and sell asphalt.

6.      Petróleo Brasileiro S.A. - Petrobras ("Petrobras") was a Brazilian state-owned and state-controlled oil company headquartered in Rio de Janeiro, Brazil, that operated to refine, produce and distribute oil, oil products, gas, biofuels and energy.  The Brazilian government directly owned more than 50 percent of Petrobras's common shares with voting rights.  Petrobras was controlled by Brazil and performed government functions. Petrobras was thus an "instrumentality" of a foreign government, and Petrobras's officers

and employees were "foreign officials," as those terms are used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-2(h)(2).

7.      Petroleos de Venezuela S.A. ("PDVSA") was the Venezuelan state-owned and state-controlled oil company.  PDVSA and its subsidiaries and affiliates were responsible for exploration, production, refining, transportation and trade in energy resources in Venezuela.  Among other products, PDVSA supplied asphalt to companies around the world and also provided funding for various operations of the Venezuelan government. PDVSA and its wholly-owned subsidiaries were "instrumentalities" of the Venezuelan government, and PDVSA's officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2).

8.      Empresa Publica de Hidrocarburos del Ecuador ("Petroecuador") was the state-owned oil company of Ecuador.  Petroecuador was wholly-owned and controlled by the government of Ecuador and performed a function that Ecuador treated as its own. Petroecuador was an "instrumentality" of the Ecuadorian government, and Petroecuador's officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

9.      Daniel Sargeant ("Sargeant") was a citizen of the United States who worked primarily in the United States as an executive and part owner of SMI, Asphalt Trading and SMI Affiliate from approximately 2006 through 2016.  In or about and between 2012 and 2016, Sargeant was an executive and one of the chief decision-makers at SMI, Asphalt Trading and SMI Affiliate.  From in or about February 2016 through the present,

Sargeant was an executive at Joint Venture.  Sargeant's responsibilities in these roles included seeking, approving and overseeing contracts with Petrobras, PDVSA and Petroecuador for SMI, Asphalt Trading and SMI Affiliate.  Sargeant was a "United States person," a "domestic concern," an employee of a "domestic concern" and an agent of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(1) and 78dd-2(i).

10.     Asphalt Trading Executive, an individual whose identity is known to the United States and the defendant, was a citizen of the United States.  From approximately 2006 through May 2012, Asphalt Trading Executive worked in the United States as an executive of Asphalt Trading and SMI.  Asphalt Trading Executive remained a part owner of Asphalt Trading through approximately July 2015.  Asphalt Trading Executive's responsibilities included seeking, approving and overseeing contracts for SMI and Asphalt Trading with Petrobras and PDVSA.  Asphalt Trading Executive was a "United States person," a "domestic concern," an employee of a "domestic concern" and an agent of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(1) and 78dd-2(i).

11.     Asphalt Trading Employee, an individual whose identity is known to the United States and the defendant, was a citizen of the United States who worked in the United States for SMI-related companies from approximately 2006 through 2018.  Asphalt Trading Employee's responsibilities included seeking contracts for SMI, Asphalt Trading and related companies with Petrobras, PDVSA and Petroecuador.  Asphalt Trading

Employee was a "domestic concern," an employee of a "domestic concern" and an agent of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

12.     SMI Employee, an individual whose identity is known to the United States and the defendant, was a citizen of Venezuela and legal permanent resident of the United States as of at least 2017.  SMI Employee worked at SMI in or about and between 2012 and 2018.  SMI Employee's responsibilities included seeking contracts for SMI, Asphalt Trading and related companies with PDVSA.  SMI Employee was an employee of a "domestic concern" and an agent of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

13.     Intermediary #1, an individual whose identity is known to the United States and the defendant, was a citizen of Brazil who worked in Brazil and the United States as an agent for Asphalt Trading from approximately the end of 2009 through at least early 2016.  Intermediary #1's responsibilities included seeking contracts for SMI and Asphalt Trading with Petrobras.  Intermediary #1 was an agent of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

14.     Intermediary #2 and Intermediary # 3, individuals whose identities are known to the United States and the defendant, were citizens of Brazil who resided in Rio de Janeiro, Brazil.  Intermediary #2 and Intermediary #3 were businesspeople who were involved in arranging the payment of bribes to foreign officials by companies that wished to do business with Petrobras.  Intermediary #2 and Intermediary #3 were hired to act as agents

on behalf of SMI and Asphalt Trading to secure business with Petrobras by paying bribes to Petrobras and other government officials.  Intermediary #2 and Intermediary #3 were agents of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

15.     Petrobras Official #1, an individual whose identity is known to the United States and the defendant, was a citizen of Brazil and a high-ranking executive at Petrobras from approximately in or about 2004 through in or about 2012.  Petrobras Official #1 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2).

16.     Petrobras Official #2, an individual whose identity is known to the United States and the defendant, was a citizen of Brazil and an executive at Petrobras with responsibility over asphalt contracts beginning in or about September 2010 to December 2015.  Petrobras Official #2 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2).

17.     Brazilian Politician #1, an individual whose identity is known to the United States and the defendant, was a citizen of Brazil and a member of the Brazilian Congress until 2012.  Brazilian Politician #1 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2).

18.     Brazilian Politician #2, an individual whose identity is known to the United States and the defendant, was a citizen of Brazil and a minister in the Brazilian

government until approximately 2014.  Brazilian Politician #2 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2).

19.     Intermediary #4, an individual whose identity is known to the United States and the defendant, was a citizen of Venezuela and a naturalized United States citizen as of approximately 2014 who worked as an agent for SMI, Asphalt Trading, SMI Affiliate and Joint Venture.  Intermediary #4 was a "domestic concern" and an agent of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

20.     PDVSA Official #1, an individual whose identity is known to the United States and the defendant, was a dual citizen of Spain and Venezuela with responsibility over asphalt contracts for PDVSA in or about and between 2011 and March 2015.  PDVSA Official #1 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2).

21.     PDVSA Official #2, an individual whose identity is known to the United States and the defendant, was a citizen of Venezuela and a supervisor at PDVSA of PDVSA Official #1 in or about and between 2011 and 2015.  PDVSA Official #2 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd- 2(h)(2).

22.     PDVSA Official #3, an individual whose identity is known to the United States and the defendant, was a citizen of Venezuela and an analyst at PDVSA who was involved in asphalt contracts for PDVSA in or about and between 2011 and 2016.

8

PDVSA Official #3 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2).

23.    PDVSA Official #4, an individual whose identity is known to the United States and the defendant, was a citizen of Venezuela and an employee of PDVSA who was involved in asphalt contracts for PDVSA in or about and between 2011 and 2018. PDVSA Official #4 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2).

24.    Intermediary #5, an individual whose identity is known to the United States and the defendant, was a citizen of Ecuador, Spain and the United States. Intermediary #5, along with a close relative, provided consulting services, incorporated consulting businesses and opened bank accounts in the United States and elsewhere that were used to facilitate the payment of bribes to Ecuadorian officials for companies including SMI. Intermediary #5 was a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

25.    Petroecuador Official #1, an individual whose identity is known to the United States and the defendant, was a citizen of Ecuador and served as a senior manager at Petroecuador from approximately in or about 2010 through 2017.  Petroecuador Official #1 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2).

II.     The Foreign Corrupt Practices Act

26.     The FCPA was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to corruptly offer, promise, authorize or pay money or anything of value, directly or indirectly, to a foreign government official to secure an improper advantage for the purpose of obtaining or retaining business for, or directing business to, any person.

III.    The Bribery Schemes

27.     In or about and between 2010 and 2018, SMI, through certain of its employees and agents, knowingly and willfully conspired and agreed with others to corruptly offer and pay bribes to, and for the benefit of, foreign officials in Brazil, Venezuela, and Ecuador, including Petrobras Official #1, Petrobras Official #2, Brazilian Politician #1, Brazilian Politician #2, PDVSA Official #1, PDVSA Official #2, PDVSA Official #3, PDVSA Official #4 and Petroecuador Official #1, to secure an improper advantage in order to obtain and retain business from Petrobras, PDVSA and Petroecuador.  As a result of the bribery schemes, SMI and its affiliated companies earned profits in excess of $38 million.

A.     The Brazil Bribery Scheme

28.     In or about and between 2010 and 2015, SMI, through certain of its employees and agents, including Sargeant, Asphalt Trading Executive, Asphalt Trading Employee, Intermediary #1, Intermediary #2 and Intermediary #3, knowingly and willfully conspired and agreed with others to corruptly offer and pay bribes to, and for the benefit of, government officials in Brazil, including Petrobras Official #1, Petrobras Official #2,

Brazilian Politician #1 and Brazilian Politician #2, to secure an improper advantage in order to obtain and retain business with Petrobras and to win millions of dollars in contracts from Petrobras.

29.     To facilitate the bribery scheme and to conceal the true nature of the bribe payments, SMI and its co-conspirators, among other things, created fake consulting contracts and fake invoices, made payments from the United States to offshore bank accounts held in the name of shell companies that were controlled by Intermediary #2 and Intermediary #3, and caused bribe payments to be made in cash and through other means.

30.     In furtherance of the scheme, the co-conspirators, including Sargeant, Asphalt Trading Executive, Asphalt Trading Employee, Intermediary #1 and Intermediary #3, used U.S.-based email accounts to communicate with each other and other individuals about the scheme.

1.     SMI and Its Employees and Agents Agreed to Bribe Brazilian Officials to Obtain and Retain Business from Petrobras

31.     In or about January 2010, Sargeant, Asphalt Trading Executive, Asphalt Trading Employee and Intermediary #1 traveled to Brazil to identify an agent with connections to Petrobras Official #1 who could help them win business from Petrobras, but were unsuccessful.

32.     In or about June 2010, Intermediary #1 was introduced to Intermediary #2, a "lobbyist" who was known for paying bribes and for his connections to Petrobras.

33.     In or about July 2010, Asphalt Trading Executive returned to Brazil to meet with Intermediary #2, and hired Intermediary #2 to corruptly assist SMI with winning business from Petrobras.  At this time, Asphalt Trading Executive told Sargeant that Intermediary #2 would pay bribes to Petrobras Official #1.

34.     Intermediary #2 believed that a competitor of SMI was winning contracts from Petrobras because that competitor was favored by a particular Brazilian politician and was likely paying bribes to that politician.  In an effort to win that business from Petrobras for SMI, Intermediary #2 arranged a dinner with Petrobras Official #1 and Brazilian Politician #1, a powerful member of the Brazilian Congress at the time.

35.     At the dinner, Intermediary #2 told Petrobras Official #1 and Brazilian Politician #1 that if they assisted SMI with winning business from Petrobras, they would be paid bribes on the resulting contracts.  Petrobras Official #1 and Brazilian Politician #1 agreed to the scheme, and Petrobras Official #1 directed his subordinates in the asphalt department to give business to SMI.

36.     Around the same time, Intermediary #2 contacted Intermediary #1 and began negotiating the amount of payment he would receive from SMI, a portion of which Intermediary #2 would pass to the Brazilian officials as bribes.  Intermediary #1 ultimately received authorization from Asphalt Trading Employee, who received authorization, in turn, from Asphalt Trading Executive, to pay Intermediary #2 and Intermediary #3 (who worked with Intermediary #2) money in association with any Petrobras contracts they obtained.

12

These corrupt payments were disguised on SMI's books as "commissions" associated with the contracts.

37.     During the negotiations, Intermediary #1, Intermediary #3 and other members of the conspiracy communicated using a U.S.-based email account to which members of the conspiracy had the password and login information to, among other things, negotiate bribe payments.  When one member of the conspiracy wanted to communicate using this method, they would draft an email using the account and save it in the drafts folder.  They would then tell another member of the conspiracy to log in and check the drafts folder in the account.  In this way, the co-conspirators were able to communicate remotely without actually transmitting emails outside of the email account.

38.     On or about August 9, 2010, Sargeant sent an email to Asphalt Trading Executive informing him of the "good news" that Asphalt Trading's ships had completed two shipments of asphalt to Petrobras.  Asphalt Trading Executive sent an email in response stating, "Wow guess last Brazil trip with crooks paid off.  Should go again before contract next year gets hot and heavy."

39.     In or about September 2010, Petrobras Official #2 began working in the asphalt department at Petrobras.  Thereafter, SMI, through certain agents and employees, including Intermediary #1, Intermediary #2 and Intermediary #3, began offering and paying bribes to Petrobras Official #2.

2.      SMI and Its Agents and Employees Used Offshore Bank Accounts and
        Shell Companies to Facilitate and Conceal the Bribe Payments

40.      To facilitate the bribery scheme and to conceal the bribe payments SMI

made to Brazilian government officials including Petrobras Official #1, Petrobras

Official #2, Brazilian Politician #1, Brazilian Politician #2 and Asphalt Trading Company

entered into a fake consulting agreement with a shell company controlled by Intermediary #2

and Intermediary #3.

41.      In total, SMI and its affiliated companies, including Asphalt Trading

and SMI Affiliate, paid more than $5 million into offshore bank accounts held in the names

of shell companies controlled by Intermediary #1, Intermediary #2 and Intermediary #3 to

pay the bribes to Brazilian government officials.  Intermediary #1, Intermediary #2, and

Intermediary #3 then paid a portion of those corrupt payments to Brazilian government

officials, either in cash or via shell company bank accounts controlled by the officials and

their relatives.  Some of the wire transfers that were made to effect the bribe payments

passed through the Eastern District of New York.

42.      For example, on or about September 15, 2010, a Dutch affiliate of SMI

wired approximately $929,218 to a shell company bank account controlled by

Intermediary #2 and Intermediary #3.  Subsequently, on or about September 23, 2010,

$225,151 from the shell bank account controlled by Intermediary #2 and Intermediary #3

was sent to a shell company bank account held for the benefit of Brazilian Politician #1.

43.      In or about July 2011, to continue to facilitate and conceal the bribery

scheme, Asphalt Trading Company entered into a fake consulting agreement with another shell company that was controlled by Intermediary #2 and Intermediary #3.  SMI and its co-conspirators made payments pursuant to the fake contract.  For example, on or about March 31, 2012, a Dutch affiliate of SMI wired approximately $113,396 to a shell company bank account controlled by Intermediary #2 and Intermediary #3.

44.     Subsequently, SMI and its affiliated companies began making corrupt payments to offshore bank accounts in the names of shell companies controlled by Intermediary #1.  Intermediary #1, Intermediary #2 and Intermediary #3 then distributed the bribe payments to the Brazilian government officials, including by making payments from bank accounts located in Uruguay and Panama.

45.     For example, on or around July 9, 2012, a shell company bank account controlled by Intermediary #1 wired approximately $56,546 to a shell company bank account controlled by Intermediary #2 and Intermediary #3.  Subsequently, on or about July 17, 2012, approximately $11,400 was wired from the shell company bank account controlled by Intermediary #2 and Intermediary #3 to a shell company bank account controlled by Petrobras Official #1.

46.     On or about February 2, 2015, Intermediary #1 sent an email to employees at SMI Affiliate and Asphalt Trading Company, including Asphalt Trading Employee, providing a statement of account for the invoices related to one of the shell companies Intermediary #1 used to make the bribe payments in Brazil, and seeking help with outstanding payments.

47.     As a result of the Brazilian bribery scheme, in or about and between 2010 and 2015, SMI and affiliated companies earned profits of approximately $26.5 million.

B.     The Venezuela Bribery Scheme

48.     In or about and between 2012 and 2018, SMI, through certain of its employees and agents, including Sargeant, Asphalt Trading Employee, SMI Employee and Intermediary #4, knowingly and willfully conspired and agreed with others to corruptly offer and pay bribes to, and for the benefit of, foreign officials in Venezuela, including PDVSA Official #1, PDVSA Official #2, PDVSA Official #3 and PDVSA Official #4, to secure improper advantages in order to obtain and retain business with PDVSA.

49.     To facilitate the bribery scheme and to conceal the true nature of the bribe payments, SMI and its co-conspirators, among other things, created fake consulting contracts and fake invoices, made payments from the United States to offshore bank accounts held in the name of shell companies that were controlled by Intermediary #4, and caused bribe payments to be made into offshore shell company accounts.

50.     In furtherance of the scheme, the co-conspirators, including Asphalt Trading Employee, SMI Employee and Intermediary #4, used U.S.-based email accounts and U.S.-based text messaging platforms to communicate with each other and PDVSA Official #1 about the scheme.

1.      SMI and Its Employees and Agents Agreed to Bribe Venezuelan
        Officials to Obtain and Retain Business from PDVSA

51.     Prior to 2012, PDVSA refused to sell asphalt to SMI or companies related to SMI.  To circumvent this prohibition, SMI and Swiss Asphalt Company agreed that Swiss Asphalt Company would purchase asphalt from PDVSA at the request and direction of SMI, and then resell that asphalt to SMI at a small premium.

52.     For Swiss Asphalt Company to obtain the contracts, SMI, through certain agents and employees, including Sargeant, SMI Employee, Asphalt Trading Employee and Intermediary #4, agreed to offer and pay bribes to PDVSA Official #1 and PDVSA Official #2.

53.     To facilitate the bribe payments and to conceal the bribe payments, SMI and its co-conspirators caused SMI Affiliate to enter into fake consulting contracts with Intermediary #4.

54.     Pursuant to the fake contracts, Intermediary #4 received a commission, typically calculated on a per barrel basis, for asphalt that Swiss Asphalt Company purchased from PDVSA and provided to SMI.  Intermediary #4 in turn paid a bribe to PDVSA Official #1, typically calculated on a per barrel basis, for the asphalt that PDVSA sold to Swiss Asphalt Company.  PDVSA Official #1 also shared a portion of those bribe payments with PDVSA Official #2.

55.     In or about and between 2013 and 2015, SMI and SMI Affiliate paid approximately $1.2 million into U.S. and offshore bank accounts in the names of shell

companies controlled by Intermediary #4, and Intermediary #4 passed a portion of that money to PDVSA Official #1 and PDVSA Official #2.

56.     For example, on or about January 6, 2014, Intermediary #4 submitted an invoice to SMI for consulting services totaling $19,497.60.  On or about January 17, 2014, SMI caused a $19,497.60 wire payment to be made from a bank account it controlled in Miami, Florida to a bank account controlled by Intermediary #4 in Miami, Florida. Subsequently, on or about January 21, 2014, Intermediary #4 caused a $47,788.20 wire payment to be made from a bank account Intermediary #4 controlled in Miami, Florida to a bank account controlled by PDVSA Official #1 in Panama.

57.     In approximately March 2015, PDVSA Official #1 stopped working at PDVSA and began working at a company that did business with PDVSA as a counter-party, buying and selling petrochemical products.

58.     Also in approximately March 2015, SMI and its co-conspirators agreed to pay bribes to PDVSA officials, through Intermediary #4 and PDVSA Official #1, in exchange for receiving non-public information from PDVSA and to obtain a competitive advantage in obtaining and retaining business with PDVSA.

59.     In furtherance of this scheme, among other things, PDVSA Official #1 and Intermediary #4 obtained non-public information from foreign officials, including PDVSA Official #3 and PDVSA #4, and provided it to Intermediary #4, who provided that information to SMI and SMI Affiliate.

60.     To facilitate the scheme and to conceal the scheme and its participants, Asphalt Trading Employee, SMI Employee and PDVSA Official #1 used code names, including "Oil Trader," "Tony," and "Tony 2" to refer to PDVSA Official #1, PDVSA Official #3 and PDVSA Official #4.  They also used the code word "Chocolates" to refer to the confidential information that was obtained through the corrupt bribery scheme.

61.     For example, on or about September 19, 2013, SMI Employee sent an email to Intermediary #4 asking him for internal, non-public information about PDVSA from PDVSA Official #1, and using the code name "Oiltrader" to refer to PDVSA Official #1.

62.     On or about July 22, 2017, PDVSA Official #1 sent Intermediary #4 an email with the subject line "chocolates agosto 17," attaching an internal PDVSA document containing confidential information titled "CHOCOLATES 0807.xls."

63.     To facilitate the bribe payments and to conceal the bribe payments, SMI and its co-conspirators caused Joint Venture to enter into a fake consulting agreement with Intermediary #4, pursuant to which Intermediary #4 received a $2,000 monthly retainer from which Intermediary #4 paid bribes to PDVSA Officials #1, #3 and #4.

64.     On or about February 11, 2016, SMI Employee sent an email to the director of SMI Affiliate, copying Asphalt Trading Employee and Sargeant, attaching a Past Due Statement from Intermediary #4 and stating: "Per information from Dan he has approved and giving [sic] you payment instructions for the attached invoice. Since we are very sensitive on time due to new activities are ready to start. Please advise me as soon as wire transfer goes out as I need to manage the situation."

65.     As a result of the Venezuela bribery scheme, SMI and its affiliated entities earned profits of approximately $8.2 million.

2.     SMI and Its Employees and Agents Agreed to Bribe Venezuelan Officials to Obtain Payment of Demurrage Fees

66.     PDVSA was required to pay penalties (called demurrage fees) to Swiss Asphalt Company, which, in its role as a pass-through, it then remitted to SMI.  To recover the amount of these penalties, SMI and its co-conspirators, including Intermediary #4 and PDVSA Official #1, agreed to pay, and paid, bribes to various PDVSA employees in exchange for their authorization of PDVSA's payment of demurrage fees to Swiss Asphalt Company.

67.     In furtherance of the scheme, on or about August 18, 2014, PDVSA Official #1 forwarded an email to Intermediary #4 attaching an internal PDVSA email assessing the demurrage fees PDVSA owed in connection with various shipments.

C.     The Ecuador Bribery Scheme

68.     In or about 2014, SMI, through certain of its employees and agents, knowingly and willfully conspired and agreed with others to corruptly offer and pay bribes to, and for the benefit of, foreign officials in Ecuador, including Petroecuador Official #1, to secure an improper advantage in order to obtain and retain business with Petroecuador and win lucrative contracts with Petroecuador.

69.     To facilitate the bribery scheme and to conceal the true nature of the bribe payments, SMI and its co-conspirators, among other things, created fake consulting

contracts and fake invoices and made payments from bank accounts in the United States to offshore bank accounts held in the name of shell companies that were controlled by Intermediary #5 and Intermediary #5's close relative.

70.     In furtherance of the scheme, the co-conspirators, including Asphalt Trading Employee, SMI Employee and Intermediary #5, used U.S.-based email accounts to communicate with each other and other individuals about the scheme.

71.     For example, in or about June 2014, SMI Employee received a call from Intermediary #5, who told SMI Employee that Petroecuador needed a supply of asphalt.

72.     In or about June 2014, Intermediary #5 and Petroecuador Official #1 met with SMI Employee and Asphalt Trading Employee and explained the requirements of the project.  They stated that an official request would be made through a tender from Petroecuador.

73.     In or about June 2014, SMI Employee and Asphalt Trading Employee attended another meeting with Intermediary #5 at a restaurant in Florida.  SMI Employee understood that there was a high probability that some of the money paid to Intermediary #5 would be passed to Petroecuador Official #1 as a bribe to obtain business for the benefit of SMI.  At the meeting it was agreed that Intermediary #5 would receive a $2 per barrel commission if SMI won the tender.

74.     To facilitate the bribery scheme and to conceal the bribe payments, on or about July 1, 2014, SMI Affiliate entered into a fake consulting agreement with an offshore shell company associated with Intermediary #5 and Intermediary #5's close relative.

Intermediary #5 subsequently submitted approximately $471,881 in invoices for payment pursuant to the fake agreement.

75.     For example, on or about November 20, 2014, Intermediary #5 sent an invoice for $188,752.85 to SMI Affiliate for payment.

76.     After Intermediary #5 received payment on the invoices, Intermediary #5 wired a portion of the money to a bank account controlled by Petroecuador Official #1.

77.     As a result of the bribery scheme, SMI earned profits of approximately $3.2 million.

## CONSPIRACY TO VIOLATE THE FCPA

78.     The allegations contained in paragraphs one through 77 are realleged and incorporated as if fully set forth in this paragraph.

79.     In or about and between 2010 and 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant Sargeant Marine Inc. ("SMI"), together with others, did knowingly and willfully conspire to commit one or more offenses against the United States, to wit:

(a)     being a domestic concern, an employee of a domestic concern and an agent of a domestic concern, to make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, to a foreign political

22

party and official thereof, and to a person while knowing that all and a portion of such money and thing of value would be offered, given, and promised to a foreign official and to a foreign political party and official thereof, for purposes of:  (i) influencing acts and decisions of such foreign official, foreign political party and official thereof in his, her and its official capacity; (ii) inducing such foreign official, foreign political party and official thereof to do and omit to do acts in violation of the lawful duty of such official and party; (iii) securing any improper advantage; and (iv) inducing such foreign official, foreign political party and official thereof to use his, her and its influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist SMI and others in obtaining and retaining business for and with, and directing business to, SMI and others, contrary to Title 15, United States Code, Section 78dd-2; and

(b)    while in the territory of the United States, to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, to a foreign political party and official thereof, and to a person while knowing that all or a portion of such money and thing of value would be offered, given, and promised to a foreign official and to a foreign political party and official thereof, for purposes of: (i) influencing acts and decisions of such foreign official, foreign political party and official thereof in his, her and its official capacity; (ii) inducing such foreign official, foreign political

party and official thereof to do and omit to do acts in violation of the lawful duty of such

official and party; (iii) securing any improper advantage; and (iv) inducing such foreign

official, foreign political party and official thereof to use his, her and its influence with a

foreign government and agencies and instrumentalities thereof to affect and influence acts

and decisions of such government and agencies and instrumentalities, in order to assist SMI

Affiliate and others in obtaining and retaining business for and with, and directing business

to, SMI and others, contrary to Title 15, United States Code, Section 78dd-3.

80.     In furtherance of the conspiracy and to effect its objects, within the

Eastern District of New York and elsewhere, the defendant Sargeant Marine Inc., together

with others, committed, and caused to be committed, among others, at least one of the

following:

<u>OVERT ACTS</u>

(a)     On or about July 5, 2010, Asphalt Trading Employee sent an

email to Sargeant and Asphalt Trading Executive reporting that "one of the 'expediters' in

Brazil 'working' the Petrobras contract" was in Florida and would come to the office for

SMI and Asphalt Trading the next day.

(b)     On or about August 9, 2010, Sargeant sent an email to Asphalt

Trading Executive informing him of the "good news" that Asphalt Trading's ships had

completed two shipments of asphalt to Petrobras.

(c)     On or about August 9, 2010, Asphalt Trading Executive sent an

email in response to the email sent by Sargeant referenced in Paragraph 80(b),

acknowledging, "Wow guess last Brazil trip with crooks paid off.  Should go again before contract next year gets hot and heavy."

(d)     On or about September 10, 2010, Intermediary #1, Petrobras Official #2 and Intermediary #3 traveled from Brazil to the United States to meet with executives and employees of SMI and Asphalt Trading, including Asphalt Trading Employee and Asphalt Trading Executive.

(e)     On or about September 15, 2010, an executive at Asphalt Trading sent an email to Sargeant confirming the company's transfer of $929,217.66 to the bank account of a company controlled by Intermediary #2 and reporting the following to Sargeant: "Regarding Brazil. Paid in full."

(f)     On or about October 4, 2011, Asphalt Trading Company wired $126,552.24 from a bank account in Florida that it controlled, through the Eastern District of New York, to a bank account in Switzerland of a company controlled by Intermediary #2.

(g)     On or about September 19, 2013, SMI Employee sent an email to Intermediary #4 asking him for internal, non-public PDVSA information from PDVSA Official #1, and using the code name "Oiltrader" to refer to PDVSA Official #1.

(h)     On or about September 25, 2013, Intermediary #1 sent an email to Asphalt Trading Employee attaching an invoice from "[o]ur friends."

(i)     On or about September 25, 2013, Asphalt Trading Employee forwarded to management at SMI Affiliate the email from Intermediary #1 and the invoice from "[o]ur friends" referenced in Paragraph 80(h) with a request to "Please pay."

25

(j)     On or about August 18, 2014, SMI Employee forwarded an email to Asphalt Trading Employee that SMI Employee had received from Intermediary #4 and that Intermediary #4 had previously received from PDVSA Official #1.  This email contained an internal PDVSA email regarding PDVSA's assessment of the demurrage fees it owed in connection with various asphalt shipments.

(k)     On or about February 11, 2016, SMI Employee sent an email to the director of SMI Affiliate, copying Asphalt Trading Employee and Sargeant, attaching a Past Due Statement from Intermediary #4 and stating:

> Per information from [the executive at SMI] he has approved and giving [sic] you payment instructions for the attached invoice.  Since we are very sensitive on time due to new activities are ready to start.  Please advise me as soon as wire transfer goes out as I need to manage the situation.

(Title 18, United States Code, Sections 371 and 3551 et seq.)


SETH D. DuCHARME
Acting United States Attorney
Eastern District of New York


DANIEL S. KAHN
Acting Chief, Fraud Section
Criminal Division, Dept. of Justice